# ORIGINAL

## In the United States Court of Federal Claims

FILED

**No. 13-352C**
**Filed: October 10, 2014**

OCT 1 0 2014

U.S. COURT OF FEDERAL CLAIMS

* * * * * * * * * * * * *

|  |  |
|---|---|
| **PHYLLIS AUSTIN** and **PENELOPE BURRIS,** | * <u>Pro Se</u> Plaintiffs, Breach of |
| | * Contract; Motion to Dismiss; |
| | * Lack of Subject Matter |
| **Plaintiffs,** | * Jurisdiction; Failure to State a |
| | * Claim; Federal Crop Insurance |
| **v.** | * Reform and Department of |
| | * Agriculture Reorganization Act |
| **UNITED STATES,** | * of 1994, 7 U.S.C. § 6901, et seq. |
| | * |
| **Defendant.** | * |
| | * |

* * * * * * * * * * * * *

**Phyllis Austin** and **Penelope Burris**, Doniphan, MO, <u>pro se</u>.

**Zachary J. Sullivan**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were **Stuart F. Delery**, Assistant Attorney General, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation, and **Kirk T. Manhardt**, Assistant Director, Civil Division. Of Counsel, **David W. Schaaf**, United States Department of Agriculture, Kansas City, MO.

## O P I N I O N

<u>HORN, J.</u>

### FINDINGS OF FACT

Plaintiffs, Phyllis Austin and Penelope Burris, filed a transfer complaint in the United States Court of Federal Claims alleging breach of contract by the United States. Plaintiffs previously filed a complaint against the United States Department of Agriculture, Rural Development in the Circuit Court of Ripley County, Missouri. At the request of the defendant, the United States Department of Agriculture, Rural Development, Rural Housing Service (USDA-RD, RHS), an agency of the United States Department of Agriculture, the case was removed to the United States District Court for the Eastern District of Missouri, Southeastern Division. The government filed a motion to dismiss in the Eastern District of Missouri for lack of subject matter jurisdiction based

on the Tucker Act, 28 U.S.C. § 1491(a) (2012).[1] Plaintiffs responded with a request that the venue be changed to the United States Court of Federal Claims. Plaintiffs' motion was granted on March 15, 2013, and the transfer case was received and filed in this court on May 23, 2013. Pursuant to the Tucker Act, plaintiffs seek damages of at least $25,000.00 for the breach of a contract entered into between plaintiffs and the USDA-RD, RHS. In this court, defendant again moved to dismiss for lack of subject matter jurisdiction and also for failure to state a claim.

In their second amended complaint[2] plaintiffs allege a variety of breach of contract and tort claims, including:

1.  The 502 direct loan[3] is an express and implied contract with the government.

2.  Defendant withheld loan funds exceeding $28,000.00 based on invoices submitted after BARCO Construction & Design Co. (BARCO) abandoned construction. USDA-RD officials did not inspect the partially-completed home or inventory materials at the site in order to verify the invoices.

3.  Defendant accepted late lien waivers from BARCO with respect to the third payment despite the requirement that lien waivers be submitted prior to disbursement of funds.

4.  Defendant breached the loan contract by refusing to allow substitute performance insofar as defendant ignored or rejected four bids submitted by new contractors to either winterize or complete construction of the home.

---

[1] In the case in the United States District Court for the Eastern District of Missouri, the Department of Justice, on behalf of the United States, filed a motion to dismiss this matter, arguing that under the Tucker Act, the District Court lacked subject matter jurisdiction to hear plaintiffs' claims. After the case was transferred to this court, the Department of Justice proceeded to argue that the Court of Federal Claims also lacked subject matter jurisdiction to hear plaintiffs' claims. Although based on a review of the allegations and the record currently before this court, there does not appear to be a factual or legal basis for relief in this matter, the proper jurisdiction for the tort claims, the particular constitutional claims, and the claims stemming from "adverse decisions" of the USDA-RD, RHS would have been properly lodged the United States District Court, not the United States Court of Federal Claims.

[2] Plaintiffs identify their transfer complaint filed in this court as an amended complaint. On March 25, 2014, plaintiffs filed an amended complaint, which they labeled "Second Amended Complaint."

[3] The loan was made pursuant to Section 502 of the Housing Act of 1949, Pub. L. No. 81-171, 63 Stat. 413 (codified as amended in scattered sections of Title 42 of the United States Code).

5.  Defendant altered the loan agreement without plaintiffs' consent.

6.  Defendant breached the loan contract when it required plaintiffs to repay the full amount of the loan, despite the fact that a portion of the loan exceeding $59,000.00 was placed in a supervised bank account. The promissory note stated, "'Borrowers promise to repay the loan funds they <u>receive</u>.'" (emphasis in original). This was an abuse of discretion.

7.  Defendant's failure to allow plaintiffs the right to appeal an adverse decision (converting the loan to permanent financing) was an abuse of discretion.

8.  Failing "to provide Plaintiffs with a safe modest home" was an abuse of discretion.

9.  Defendant breached the contract when it declined to hold the contractor to "approved plans and federal building specifications over which they had discretion."

10. Defendant breached the contract when it failed to follow the provisions of the loan documents—the funding commitment and loan notifications required written evidence that the water, electric, and septic systems were properly functioning and met established requirements before loan closing.

11. Defendant breached a loan document when it charged plaintiffs escrow, insofar as the HUD settlement statement clearly indicates plaintiffs would not be charged escrow.

12. "Defendants [sic] breached its duty of good faith and fair dealing."

13. Defendant discouraged numerous contractors from submitting formal bids to complete plaintiffs' home, either by ignoring them or by advising said contractors that payment could be substantially delayed and would only be made when construction was fully completed.

14. Defendant failed to communicate with plaintiffs regarding the loan's status and with respect to plaintiffs' concerns about the construction company. Defendant did not inform plaintiffs of their right to challenge adverse determinations, nor did it facilitate completion of plaintiffs' home.

15. Defendant converted plaintiffs' loan into permanent financing without plaintiffs' permission, and in violation of not only the loan documents, which require a septic, plumbing, and electrical inspection by a third party, but also the USDA-RD regulations.

16. Defendant seeks to enforce an invalid mortgage agreement under which plaintiffs are required to pay excessive escrow, insurance, and taxes. Plaintiffs were not informed of the escrow payments, and mortgage payments

3

exceeded the amount they had been told. Plaintiffs were not given an opportunity to review loan documents until after they were executed, "and even then not all the loan documents were provided to them."

Although not raised in their complaints filed in this court, in the plaintiffs' response to defendant's motion to dismiss in this court, plaintiffs assert the following new claims:

1. USDA-RD, RHS erred in including the amount of food stamps plaintiffs receive as a factor in calculating their adjusted income and mortgage payment amounts.

2. Ms. Allison, a USDA-RD, RHS Area Specialist, placed undue influence on plaintiffs to sign and initial forms without understanding what they were signing.

3. USDA-RD, RHS had an "Identity of Interest in the Construction Contract" and could have prevented the builder's continued bad workmanship if it had so desired.

4. Defendant "violated Plaintiffs' rights to the fruits of the loan contract by retaliating against Plaintiffs when Plaintiffs contacted U.S. Congresswoman Joanne Emerson, which was Plaintiffs' Constitutional Right."

5. "Anita Dunning committed Fraud by repeating unsubstantiated allegations made by the builder to a federal government entity."

6. USDA-RD, RHS used the "502 Loan Regulations to deny, ignore, threaten and interfere with the utilization and successful completion of Plaintiff's 502 Direct Loan and Ancillary Build Contract and the fruits thereof while denying any obligation to [comply with] the same Regulations . . . ."

7. "Plaintiffs invoke the doctrine of Abuse of Rights . . . ."

8. Plaintiffs' Fifth and Fourteenth Amendment due process rights have been violated. USDA-RD, RHS unilaterally altered the contract and promissory note. By materially revising the promissory note without plaintiffs' knowledge, a negotiable instrument was altered in such a manner as to create a "completely different contract" and constitute forgery.

Plaintiffs request that they be awarded damages for the above claims in an amount exceeding $25,000.00, as well as any other relief the court may deem just and proper.

Defendant argues, first, that any claims based on "adverse decisions" issued by USDA-RD, RHS or that sound in tort should be dismissed for lack of jurisdiction under Rule 12(b)(1) of the Rules of the Court of Federal Claims (RCFC), and second, that pursuant to RCFC 12(b)(6), the remaining claims should be dismissed for failure to state

a claim upon which relief may be granted. Defendant argues that pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, 108 Stat. 3178 (codified at 7 U.S.C. §§ 6901 et seq. (2012)) (the Reorganization Act), this court does not have jurisdiction to review plaintiffs' claims based on "adverse decisions" issued by USDA-RD, RHS. Additionally, defendant argues that for the claims which are not dismissed for lack of jurisdiction, those claims fail to state a claim on which relief can be granted because defendant did not breach any contractual duties owed to plaintiffs.

Plaintiffs are residents of Ripley County, Missouri, and plaintiff Ms. Phyllis Austin "is the mother and primary caregiver" of plaintiff Ms. Penelope Burris. On July 29, 2010, plaintiffs signed a USDA-RD Applicant Orientation Guide, which summarizes the RHS lending program and procedures for once a loan is approved. Plaintiffs received a USDA-RD, RHS Funding Commitment and Notification of Loan Closing approving their application for a RHS Section 502 loan in the amount of $95,000.00 on November 24, 2010. Additionally, plaintiffs were issued RHS Truth in Lending Statements on November 26, 2010, for both "New" and "Regular" construction projects. The Truth in Lending Statements were signed by plaintiffs on December 12, 2010. On January 1, 2011, plaintiffs were provided with a Good Faith Estimate (GFE) originated by Kimberlin Allison, a USDA-RD Area Specialist. The GFE provided a loan in the amount of $95,000.00 with four percent interest for a term of thirty-three years, and provided plaintiffs with an estimate of their settlement charges and loan terms. The Commitment Letter was issued and signed by Ms. Allison on January 19, 2011 and by plaintiffs on January 25, 2011. Revised Truth in Lending statements for both "New" and "Regular" construction were re-issued on January 19, 2011, and again signed by plaintiffs.

A USDA-RD, RHS promissory note was issued to and signed by plaintiffs on January 25, 2011. The RHS promissory note constitutes plaintiffs' RHS Section 502 loan with four percent interest for a term of thirty-three years with a total loan amount of $95,000.00.[4] A Deed of Trust for Missouri was also issued and signed by plaintiffs on the same day, listing plaintiff Ms. Austin as the Grantor and Ms. Anita J. Dunning, State Director, USDA-RD, as the Trustee. On January 27, 2011 a deposit agreement was issued by Ms. Allison and Michelle Hobbs of USDA-RD and signed by plaintiff Ms. Austin.

On January 26, 2011, plaintiffs entered into a construction contract with Brett Robinson, doing business as BARCO. The terms of the contract provided that BARCO would "furnish materials and perform the work for [plaintiffs] . . . for the consideration of

---

[4] A copy of the RHS promissory note appears as an attachment to defendant's motion to dismiss with handwritten modifications to the document, including raising the interest rate from 4.00 percent to 4.25 percent, changing the date the interest began accruing from September 25, 2011 to May 7, 2012, and moving the day on which monthly loans payment would be due from the twenty-fifth to the seventh day of each month. These alterations to the RHS promissory note do not change the court's analysis.

Eighty Eight Thousand Five Hundred Twenty dollars ($88,520.00)." The contract also included a bid sheet from BARCO itemizing the materials and labor that comprised the estimated cost of $88,520.00. The contract stated that BARCO was to begin work on January 27, 2011 and complete the work by June 27, 2011. It also provided that partial payments would be made to BARCO in three intervals, not to exceed sixty percent of the value of the work in place (less the aggregate of previous payments). The contract included a general conditions sheet, which provided for the inspection of materials and workmanship, and included a clause for the completion of work, stating that if BARCO refused or failed to perform within the time specified, plaintiffs could, with USDA-RD's approval, terminate BARCO's right to complete the contract.

After the commencement of construction, inspections took place on three dates, and a report was generated from each inspection. The first inspection occurred on February 8, 2011 and focused on the home's footing. The report noted that construction was seventeen percent complete. The second inspection occurred on March 31, 2011, and the report noted that construction was thirty-five percent complete. The third inspection occurred on April 18, 2011, and the reported noted that construction was sixty percent complete. Plaintiff Austin paid BARCO with funds from USDA-RD shortly after each inspection. Specifically, payments were made on February 11, 2011, March 31, 2011, and April 28, 2011 for $9,029.04, $9,560.16, and $13,278.00, respectively.

The relationship between Ms. Austin and BARCO began to deteriorate around the time of the third inspection. Due to increased concerns with the quality of the construction and lack of assistance from USDA-RD, Ms. Austin had hired Don Haefner of Heartland Building Inspections to conduct an inspection of the property on April 16, 2011. Mr. Haefner concluded that, among other problems, areas of the lot needed adjustment so water could properly run off the property, the electrical junction box needed to be moved, the roof was not properly installed, insulation needed to be repaired in some places, portions of the siding needed replacement, doors were installed backwards, windows were not installed in accordance with the manufacturer's instructions, and exposed wires needed to be fixed. Ms. Allison was informed of the inspection results. Relations then disintegrated further. According to a Ripley County Sheriff Department report, dated April 18, 2011, Ms. Austin called the police to report verbal abuse and physical threats from BARCO owner Mr. Robinson's wife, Kat Robinson. On May 2, 2011, Ms. Austin contacted Monica Sullivan at the Missouri Department of Health and Senior Services, Division of Senior and Disability Services, an agency that investigates abuse and exploitation of senior citizens and individuals with disabilities. Ms. Austin reported that she had been threatened and verbally abused by Mr. Robinson. Ms. Sullivan investigated Ms. Austin's allegations and ultimately memorialized her findings in a report.

Ms. Sullivan spoke with Ms. Austin by telephone and conducted a visit of her home on May 5, 2011. During the May 5, 2011 home visit, Ms. Austin told Ms. Sullivan that she did not want Mr. Robinson to install laminate flooring for numerous reasons including the toxic chemicals contained in laminate materials and the non-durability of laminate. Ms. Austin claimed she spoke with USDA-RD about the flooring, indicating a

preference for wood flooring, and was informed that Mr. Robinson did not know how to install wood flooring. Ms. Austin claimed she found flooring that Mr. Robinson could have installed. Ms. Austin also stated that she made several requests of Mr. Robinson for specific installations in her home, including paint color, concrete pouring, and a shower stall, but Mr. Robinson "completely ignored all of her requests." Ms. Austin also alleged to Ms. Sullivan that she "signed one contract initially" but Mr. Robinson "switched the contracts" and she "signed the second contract, not realizing it had been changed." Ms. Austin told Ms. Sullivan that the contract provided that prior to each payment to BARCO, Ms. Austin was to receive an itemized list of expenses, but she was never given such a list, but nonetheless, USDA-RD continued to pay Mr. Robinson.

Ms. Austin recounted to Ms. Sullivan that she had hired Don Haefner[5] to conduct an independent inspection of the home. She told Ms. Sullivan that in his report, Mr. Haefner noted that the wiring and electrical outlets in Ms. Burris' room were improperly installed. Ms. Austin told Ms. Sullivan that Mr. Robinson "hurried and put up drywall in [Ms. Burris'] room and had insulation blow[n] in, so he would not have to redo the wiring as it would be covered up." Ms. Austin also alleged that R38 insulation was required by the contract, but Mr. Robinson used only R30 insulation. In addition to the insulation defects, Ms. Austin stated to Ms. Sullivan that Mr. Robinson's workers did not seal around the windows of the home and that the home was supposed to be made wheelchair accessible, which it ultimately was not. Finally, Ms. Sullivan noted that, according to Ms. Austin, USDA-RD informed her that although Mr. Robinson breached the contract, Ms. Austin herself must terminate Mr. Robinson. Ms. Austin stated that she refused to terminate Mr. Robinson because she feared being held liable for breach of contract. Ms. Austin claimed she researched the issue and believed USDA-RD had the power to terminate Mr. Robinson.

Ms. Sullivan next spoke with Ms. Allison, who told her that Ms. Austin had not officially terminated Mr. Robinson, and Mr. Robinson maintained he had not quit. Mr. Robinson also told USDA-RD that Ms. Austin would not let him on the property. Ms. Sullivan was informed by Ms. Allison that the issue was now the responsibility of the USDA-RD state office and the regional office was awaiting instruction on how to proceed with the matter. Ms. Sullivan and Mr. Robinson met on June 21, 2011. In that meeting, Mr. Robinson claimed that Ms. Austin had made several special requests, including a claw foot tub for Ms. Burris, granite countertops, hardwood flooring, brass or bronze metals, and soundproofed walls and a steel door for Ms. Burris' bedroom. Mr. Robinson also claimed that the inspector Ms. Austin independently hired had found nothing wrong with the home upon inspection. Following her meeting with Mr. Robinson, Ms. Sullivan finalized her report regarding Ms. Austin's complaint against Mr. Robinson. In her report, Ms. Sullivan concluded that the degree of risk for Ms. Austin was "Low."

---

[5] In her report, Ms. Sullivan spelled the inspector's name as "Heffner", however, for consistency within this opinion the court has adopted the spelling utilized by the plaintiff, "Haefner."

Additionally, Ms. Sullivan noted that Ms. Austin's allegations of verbal abuse by Mr. Robinson "may have occurred" but they could not be substantiated without witnesses.

Greg Batson of USDA-RD sent a letter, dated June 23, 2011, to Ms. Austin proposing two alternatives for proceeding with the construction of her home. The first alternative was to proceed with BARCO as her contractor, the second was to pay BARCO for the work completed to date, terminate the contract, and select another contractor to complete the home with the remaining USDA-RD funds. Mr. Batson also informed Ms. Austin that she was prohibited from removing or altering work completed during construction. Additionally, he advised Ms. Austin that failure or refusal to make final payment to BARCO could result in a mechanic's lien being placed on her property, which could ultimately lead to foreclosure. Plaintiffs decided to exercise the second option, to hire a new contractor, and began a search to find a replacement for BARCO.

On November 10, 2011, Mr. Batson again wrote to Ms. Austin informing her that USDA-RD had approved her to enter into a new construction contract to complete her home. The letter detailed the remaining funds available to complete the construction, as well as the procedural steps to be followed in order to complete the approval process. Ms. Austin terminated BARCO as her contractor by letter dated November 16, 2011. On December 12, 2011, Ms. Dunning of USDA-RD sent a letter to Ms. Austin stating that despite the November 16, 2011 termination letter, it was USDA-RD's position that Ms. Austin severed the contract with Mr. Robinson on April 22, 2011 and had yet to enter into a new contract with a qualified contractor. The December 12, 2011 letter indicated that plaintiffs needed to select a qualified contractor by December 27, 2011, and that failure to meet this deadline would result in USDA-RD converting their loan from a construction loan to a permanent loan, which would also trigger the commencement of their obligation to make mortgage payments. USDA-RD also advised that it would winterize the home, at plaintiffs' expense, should the loan be converted.

Ms. Austin replied to Ms. Dunning's letter on December 22, 2011, stating that it was her position that BARCO had abandoned the job on May 3, 2011. She also noted that BARCO had received a draw just a few days prior, on April 28, 2011. Ms. Austin enclosed a certified inspector's report with the letter and asserted that the report indicates BARCO completed only thirty-five percent of the job. Ms. Austin indicated that she had believed USDA-RD would send an inspector to inspect the home and inventory materials, but that never occurred. Ms. Austin also reiterated that while she maintains Mr. Robinson walked off the job on May 3, 2011, she formally terminated BARCO's contract by letter to Mr. Robinson on November 16, 2011. Ms. Austin noted that she felt USDA-RD had not been receptive to her requests, and she needed to take efforts, with or without USDA-RD's assistance, to protect her investment in the property. She also requested a pre-construction conference to enable her to obtain a contract with a new builder.

On January 12, 2012, Ms. Austin entered into a new construction contract with Bob Ruminer, and on February 3, 2012, Mr. Batson sent a letter to Ms. Austin providing instructions on how to proceed with Mr. Ruminer's new bid. In his letter, Mr. Batson

referenced a meeting between himself, Ms. Austin, plaintiffs' attorney Paul Kidwell, Angi Reynolds of USDA-RD, and Mr. Ruminer regarding the progress of plaintiffs' home and the work Mr. Ruminer was to complete. The letter also stated that Mr. Ruminer was supposed to have submitted a completion bid by January 25, 2012, but as of the date of the letter it had not yet been received. Mr. Batson stated that the bid must be received by February 10, 2012 or USDA-RD would be obliged to convert the loan to permanent financing status, which would commence the requirement for plaintiffs to make payments on the loan.

On February 15, 2012, Mr. Batson sent a follow-up letter to Ms. Austin confirming a telephone conversation that had occurred the previous day between himself and Ms. Austin. The letter noted that the telephone connection from the prior day had been terminated prematurely. Mr. Batson advised that the USDA-RD National Office had instructed him to proceed with converting plaintiffs' loan from construction status to permanent financing. The letter provided instructions for Ms. Austin on how to complete the home, noting that she should contact her contractor and impress upon him the importance of submitting a timely bid.

On February 24, 2012, Ms. Austin submitted a bid to USDA-RD from Mike Hardin of Raylee Construction for $51,770.00. Mr. Batson replied to Ms. Austin by letter on March 14, 2012, stating that Mr. Hardin's bid could not be accepted because it exceeded $26,685.00, the remaining available balance of USDA-RD funding for plaintiffs' construction project. Mr. Batson also noted that Mr. Hardin's bid contained work for items that had already been completed by BARCO. Mr. Batson offered Ms. Austin the option either to cancel the remaining funds or to disburse such funds into a supervised bank account in order to ultimately continue construction. Under either option, the loan would be converted from a construction loan to permanent financing. Mr. Batson requested that Ms. Austin reply no later than March 21, 2012.

On April 4, 2012, Mr. Batson sent a subsequent letter to Ms. Austin noting that USDA-RD had not received a reply to its March 14, 2012 letter. He noted that the proposed action by USDA-RD was to convert plaintiffs' loan from construction status to permanent financing and to cancel all remaining funds, resulting in a permanent loan in the amount of $68,315.00. The letter also noted that the cancellation of remaining funds meant no additional funding from USDA-RD would be available to plaintiffs and the completion of the home would become plaintiffs' responsibility. Finally, the letter advised that failure to make payments on the loan would result in foreclosure. On April 27, 2012, Mr. Batson sent another letter to Ms. Austin noting that she had yet to respond to repeated requests from USDA-RD for her to select a financing option for the remaining funds. The letter noted that USDA-RD had decided not to cancel the remaining funds, resulting in the entire amount of plaintiffs' $95,000.00 loan being converted to permanent financing. The letter stated the conversion of the loan would commence on May 7, 2012.

From May 23, 2012 to December 24, 2012 plaintiffs received monthly billing statements for the payment of their loan. From July 23, 2012 onward the bills increased

in the amount due because Ms. Austin ceased making payments on the loan. Prior to ceasing payments on the loan, Ms. Austin appears to have made two separate payments, on July 1, 2012 and July 7, 2012, each in the amount of $580.56. On March 26, 2013, Ms. Dunning sent a letter to Ms. Austin enclosing a Notice of Trustee's Sale of plaintiffs' property for default in the payment of debt on their loan. The Trustee's sale was scheduled for May 6, 2013.

On June 1, 2011, prior to plaintiffs bringing suit in this court, BARCO had filed a lawsuit against Ms. Austin and Ms. Burris in the Circuit Court of Ripley County, Missouri. In its complaint, BARCO alleged breach of contract by Ms. Austin and Ms. Burris for failing to pay for work performed, altering Mr. Robinson's work, and threatening him and his employees. BARCO sought damages in the amount of $56,652.80. Judgment was entered in favor of BARCO for damages in the amount of $35,000.00, plus costs. Ms. Austin and Ms. Burris filed a motion to set aside the judgment on the basis that their defense attorney in the lawsuit, Paul Kidwell, had been previously disbarred, but had failed to inform Ms. Austin and Ms. Burris of that fact. An order and judgment setting aside the judgment and jury verdict in favor of BARCO was granted.

## DISCUSSION

When determining whether a complaint filed by a pro se plaintiff is sufficient to invoke review by a court, pro se plaintiffs are entitled to liberal construction of their pleadings. See Haines v. Kerner, 404 U.S. 519, 520–21 (requiring that allegations contained in a pro se complaint be held to "less stringent standards than formal pleadings drafted by lawyers"), reh'g denied, 405 U.S. 948 (1972); see also Erickson v. Pardus, 551 U.S. 89, 94 (2007); Hughes v. Rowe, 449 U.S. 5, 9–10 (1980); Estelle v. Gamble, 429 U.S. 97, 106 (1976), reh'g denied, 429 U.S. 1066 (1977); Matthews v. United States, 750 F.3d 1320, 1322 (Fed. Cir. 2014); Diamond v. United States, 115 Fed. Cl. 516, 524 (2014). "However, "'[t]here is no duty on the part of the trial court to create a claim which [the plaintiff] has not spelled out in his pleading.""" Lengen v. United States, 100 Fed. Cl. 317, 328 (2011) (alterations in original) (quoting Scogin v. United States, 33 Fed. Cl. 285, 293 (1995) (quoting Clark v. Nat'l Travelers Life Ins. Co., 518 F.2d 1167, 1169 (6th Cir. 1975))); see also Bussie v. United States, 96 Fed. Cl. 89, 94, aff'd, 443 F. App'x 542 (Fed. Cir. 2011); Minehan v. United States, 75 Fed. Cl. 249, 253 (2007). "While a pro se plaintiff is held to a less stringent standard than that of a plaintiff represented by an attorney, the pro se plaintiff, nevertheless, bears the burden of establishing the Court's jurisdiction by a preponderance of the evidence." Riles v. United States, 93 Fed. Cl. 163, 165 (2010) (internal citations omitted) (citing Hughes v. Rowe, 449 U.S. at 9 and Taylor v. United States, 303 F.3d 1357, 1359 (Fed. Cir.) ("Plaintiff bears the burden of showing jurisdiction by a preponderance of the evidence."), reh'g and reh'g en banc denied (Fed. Cir. 2002)); see also Harris v. United States, 113 Fed. Cl. 290, 292 (2013) ("Although plaintiff's pleadings are held to a less stringent standard, such leniency 'with respect to mere formalities does not relieve the burden to meet jurisdictional requirements.'" (quoting Minehan v. United States, 75 Fed. Cl. at 253)).

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 131 S. Ct. 1197, 1202 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 909 (2011); Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) ("Subject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue." (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part, 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case."); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998)); Pikulin v. United States, 97 Fed. Cl. 71, 76 (2011), appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent

11

of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9–10 (1983)), reh'g denied (Fed. Cir. 1997); see also Compliance Solutions Occupational Trainers, Inc. v. United States, No. 13-194C, 2014 WL 4557648, at *3 (Fed. Cl., Sept. 3, 2014); Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). "Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998) (citing Epstein v. Washington Energy Co., 83 F.3d 1136, 1140 (9th Cir. 1996) and 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 315–18 (1990)); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1362 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part).

In examining what must be pled in order to state a claim, under both RCFC 8(a)(2) and Rule (8)(a)(2) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2014); Fed. R. Civ. P. 8(a)(2) (2014); see also Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The United States Supreme Court stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [Conley v. Gibson, 355 U.S. 41, 47 (1957)]; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), see, e.g., Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); Neitzke v. Williams, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–57, 570); A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354–55 (Fed. Cir.), cert. denied, 131 S. Ct. 92 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726–27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of New York v. United States, 92 Fed. Cl. 285, 292, 298, 298 n.14 (2010).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. at 508 n.1; Neitzke v. Williams, 490 U.S. at 327; Scheuer v. Rhodes, 416 U.S. at 236))); Scheuer v. Rhodes, 416 U.S. at 236 ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327–28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

First, the government argues that any and all claims which sound in tort should be dismissed for lack of jurisdiction under RCFC 12(b)(1). It is correct that this court

does not possess jurisdiction over claims that sound in tort. See 28 U.S.C. § 1491(a) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."); see also Keene Corp. v. United States, 508 U.S. 200, 214 (1993); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343; Alves v. United States, 133 F.3d 1454, 1459 (Fed. Cir. 1998); Brown v. United States, 105 F.3d 621, 623 (Fed. Cir.), reh'g denied (Fed. Cir. 1997); Golden Pac. Bancorp v. United States, 15 F.3d 1066, 1070 n.8 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 513 U.S. 961 (1994); Hampel v. United States, 97 Fed. Cl. 235, 238, aff'd, 429 F. App'x 995 (Fed. Cir. 2011), cert. denied, 132 S. Ct. 1105 (2012); Woodson v. United States, 89 Fed. Cl. 640, 650 (2009); McCullough v. United States, 76 Fed. Cl. 1, 3 (2006), appeal dismissed, 236 F. App'x 615 (Fed. Cir.), reh'g denied (Fed. Cir.), cert. denied, 552 U.S. 1050 (2007); Agee v. United States, 72 Fed. Cl. 284, 290 (2006); Zhengxing v. United States, 71 Fed. Cl. 732, 739, aff'd, 204 F. App'x 885 (Fed. Cir.), reh'g denied (Fed. Cir. 2006). Therefore, plaintiffs' claims which allege tortious actions such as negligence by defendant's employees are not cognizable in this court.

Second, the government argues that pursuant to RCFC 12(b)(6), those claims which do not sound in tort also should be dismissed for failure to state a claim upon which relief may be granted, because defendant did not breach any contractual duties owed to plaintiffs. To have privity of contract with the United States government, and, therefore, invoke the jurisdiction of the United States Court of Federal Claims for its breach of contract claim, plaintiff "must show that either an express or implied-in-fact contract underlies [the] claim." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997). "For there to be an express contract, the parties must have intended to be bound and must have expressed their intention in a manner capable of understanding. A definite offer and an unconditional acceptance must be established." Russell Corp. v. United States, 210 Ct. Cl. 596, 606, 537 F.2d 474, 481 (1976), cert. denied, 429 U.S. 1073 (1977). Implied-in-fact contracts are agreements "'"founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."'" Trauma Serv. Grp. v. United States, 104 F.3d at 1325 (quoting Hercules, Inc. v. United States, 516 U.S. 417, 424 (1996) (quoting Balt. & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923))); see also Kam-Almaz v. United States, 682 F.3d at 1368; Bank of Guam v. United States, 578 F.3d at 1329 (citing Trauma Serv. Grp. v. United States, 104 F.3d at 1326); Bay View, Inc. v. United States, 278 F.3d 1259, 1265–66 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 285 F.3d 1035 (Fed. Cir.), cert. denied, 537 U.S. 826 (2002); Westlands Water Dist. v. United States, 109 Fed. Cl. 177, 203 (2013); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. at 728 (citing Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 597; Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482. Such an agreement will not be implied "unless the meeting of minds was indicated by some

14

intelligible conduct, act or sign." Balt. & Ohio R.R. Co. v. United States, 261 U.S. at 598; see also Russell Corp. v. United States, 210 Ct. Cl. at 609, 537 F.2d at 482.

It is well settled that "[t]o recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). See also Barlow & Haun, Inc. v. United States, No. 08-847L, 2014 WL 4802941, at *19 (Fed. Cl. Sept. 26, 2014). A breach of contract claim requires: "(1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." Bell/Heery v. United States, 739 F.3d at 1330 (citing Hercules, Inc. v. United States, 24 F.3d 188, 198 (Fed. Cir.), reh'g denied, in banc suggestion declined (Fed. Cir. 1994), aff'd, 516 U.S. 1049 (1996); Trauma Serv. Grp. v. United States, 104 F.3d at 1325 ("To state a claim upon which relief can be granted, [plaintiff] must allege either an express or an implied-in-fact contract, and the breach of that contract."); San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959).

In the above captioned case, plaintiffs try to allege the existence of both an express and implied contract with the government. The breaches alleged by plaintiffs, however, do not relate to any obligations which came into existence between the plaintiffs and the government, and plaintiffs have not pointed to any duty which defendant has breached. Plaintiffs try to rely on a statement in the Funding Commitment and Notification of Loan Closing which requires that: "Written evidence the following systems are functioning properly and meet all Rural Development requirements must be submitted to Rural Development before loan closing or to the closing agent/attorney at loan closing. Water System, Heating System, Waste Disposal, Plumbing System, Electrical System." The Funding Commitment and Notification of Loan Closing document is not a contractual agreement between plaintiffs and defendant. It is a form letter from the government to plaintiffs informing them of the approval of their loan, as well as the terms of that loan. Plaintiffs also allege a breach of contract on the basis that they were charged escrow despite the indication on the HUD Settlement Statement that there would not be an escrow charge. The HUD Settlement Statement also is not a contract between plaintiffs and the government, but rather a document prepared by a

third-party settlement agent and signed by the plaintiffs, but not by any government official. There is no indication, nor have the plaintiffs alleged, that a settlement agent has the authority to bind the government. Additionally, plaintiffs point to defendant's failure to comply with agency regulations; however, unless expressly incorporated, the agency's regulations are not part of the contract. See Smithson v. United States, 847 F.2d 791, 795 (Fed. Cir. 1988) ("We must, therefore, reject appellants' contention that the agency's regulations formed an integral part of the Smithsons' contract with FmHA and that violation of any of those regulations can serve as a proper basis for the complainants' claims of breach of contract."), cert. denied, 488 U.S. 1004 (1989).

Plaintiffs also assert in their complaint, albeit not in their response to the motion to dismiss, that defendant has violated its duty of good faith and fair dealing. "All government contracts contain an implied covenant of good faith and fair dealing." Nat'l Australia Bank v. United States, 55 Fed. Cl. 782, 790 (2003), aff'd, 452 F.3d 1321 (Fed. Cir. 2006). "However, the implied obligation 'must attach to a specific substantive obligation, mutually assented to by the parties.'" Detroit Housing Corp. v. United States, 55 Fed. Cl. 410, 417 (2003) (quoting Allstates Air Cargo, Inc. v. United States, 42 Fed. Cl. 118, 124 (1998) (quoting State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996), aff'd, 119 F.3d 16 (Fed. Cir. 1997) (table), cert. denied, 522 U.S. 1108 (1998))); see also Night Vision Corp. v. United States, 68 Fed. Cl. 368, 389 (2005) ("Clearly, the case has at its predicate the existence of a valid, mutually assented-to contract, for which a covenant arises that proscribes the government from interfering with reasonable expectations flowing from that particular contract."), aff'd, 469 F.3d 1369 (Fed. Cir. 2006), cert. denied, 550 U.S. 934 (2007). "Although the implied duty of good faith and fair dealing attaches to every contract, what that duty entails depends in part on what that contract promises (or disclaims)." Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 830 (Fed. Cir.), cert. denied 131 S. Ct. 997 (2011). Additionally, in order for the plaintiffs to prevail on their claim that the government breached its duty of good faith and fair dealing, plaintiffs also must overcome the presumption that government officials act in good faith in the discharge of their duties. See ManTech Comm. and Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 74 n. 26 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002). To overcome this presumption, the plaintiffs must produce "well-nigh irrefragable proof" of bad faith on the part of the government. Kalvar Corp. v. United States, 211 Ct. Cl. 192, 198, 543 F.2d 1298, 1301–02 (1976), cert. denied, 434 U.S. 830 (1977) (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954)). "'Almost irrefragable proof' amounts to 'clear and convincing evidence'" of bad faith on the part of the government. Galen Medical Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir.) (quoting Am–Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002)), (Fed. Cir. 2004). "'In the cases where the court has considered allegations of bad faith, the necessary "irrefragable proof" has been equated with evidence of some specific intent to injure the plaintiff.'" Galen Medical Assocs., Inc. v. United States, 369 F.3d at 1330 (quoting Torncello v. United States, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982)); see also Am–Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (noting with approval cases which compared bad faith variously with actions motivated by malice, conspiracy,

oppressive conduct, and with officials actuated by animus against a particular plaintiff) (citing Kalvar Corp. v. United States, 211 Ct. Cl. at 198, 543 F.2d at 1302). In this regard, the record does not reflect that any government official acted with the specific intent to injure plaintiffs or prevent the completion of their home.[6] There is no evidence that defendant's actions were motivated by ill will against plaintiffs. The record simply does not reflect the requisite malice or specific intent to injure.

In their response to the motion to dismiss, plaintiffs, for the first time, raise constitutional claims based on the First, Fifth, and Fourteenth Amendments to the United States Constitution. Although not properly pled in this court, none of these constitutional claims are claims which this court has jurisdiction to review. The First Amendment, standing alone, cannot be interpreted to require the payment of money for an alleged violation, and, therefore, does not provide an independent basis for jurisdiction in this court. See United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir. 1983), cert. denied, 465 U.S. 1065 (1984) ("We agree with the Court of Claims that the first amendment, standing alone, cannot be so interpreted to command the payment of money."); Volk v. United States, 111 Fed. Cl. 313, 326 (2013); Cox v. United States, 105 Fed. Cl. 213, 217, appeal dismissed (Fed. Cir. 2012) ("However, because the First Amendment, standing alone, does not obligate the United States to pay money damages, it cannot serve as the basis for jurisdiction in the Court of Federal Claims.").

Regarding plaintiffs' claims for due process under the Fifth and Fourteenth Amendments to the United States Constitution, the United States Court of Appeals for the Federal Circuit has held that this court does not possess jurisdiction to consider claims arising under the Due Process clauses of the Fifth and Fourteenth Amendments. See Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (citing LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995)) (no jurisdiction over a due process violation under the Fifth and Fourteenth Amendments); see also Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.) ("The law is well settled that the Due Process clauses of both the Fifth and Fourteenth Amendments do not mandate the payment of money and thus do not provide a cause of action under the Tucker Act." (citing LeBlanc v. United States, 50 F.3d at 1028), cert. denied, 134 S. Ct. 259 (2013); In re United States, 463 F.3d 1328, 1335 n.5 (Fed. Cir. 2006) ("[B]ecause the Due Process Clause is not money-mandating, it may not provide the basis for jurisdiction under the Tucker Act."), reh'g and reh'g en banc denied (Fed. Cir. 2006), cert. denied sub nom. Scholl v. United States, 552 U.S. 940 (2007); Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d 1327, 1334 (Fed. Cir. 2006); Collins v. United States, 67 F.3d 284, 288 (Fed. Cir.) ("[T]he due process clause does not obligate the government to pay money damages."), reh'g denied (Fed. Cir. 1995); Mullenberg v. United States, 857 F.2d 770, 773 (Fed. Cir. 1988) (finding that the Due Process clauses "do not trigger Tucker Act jurisdiction in the courts"); Murray v. United States, 817 F.2d 1580, 1583 (Fed. Cir.

---

[6] The defendant did not have a role in the actual construction of plaintiffs' home, and, therefore, the United States is not the proper defendant in this court for claims brought against the contractor BARCO relating to construction of the home.

1987) (noting that the Fifth Amendment Due Process clause does not include language mandating the payment of money damages); Harper v. United States, 104 Fed. Cl. 287, 291 n.5 (2012); Hampel v. United States, 97 Fed. Cl. at 238; McCullough v. United States, 76 Fed. Cl. at 4 ("[N]either the Fifth Amendment Due Process Clause . . . nor the Privileges and Immunities Clause provides a basis for jurisdiction in this court because the Fifth Amendment is not a source that mandates the payment of money to plaintiff."). Due process claims "must be heard in District Court." Kam–Almaz v. United States, 96 Fed. Cl. 84, 89 (2011) (citing Acadia Tech., Inc. & Global Win Tech., Ltd. v. United States, 458 F.3d at 1334), aff'd, 682 F.3d 1364 (Fed. Cir. 2012); see also Hampel v. United States, 97 Fed. Cl. at 238. Therefore, to the extent that plaintiffs are attempting to raise allegations of Due Process violations, no such cause of action can be brought in this court.

Defendant's motion to dismiss also is based on the provisions of the Reorganization Act and the Act's implementing regulations, which establish specific administrative procedures for processing claims arising from participation in specified USDA programs. The purpose of the Act, as stated in 7 U.S.C. § 6901, was to provide the Secretary of Agriculture with "the necessary authority to streamline and reorganize the Department of Agriculture to achieve greater efficiency, effectiveness, and economies in the organization and management of the programs and activities carried out by the Department." 7 U.S.C. § 6901. One of the changes included in the Reorganization Act was the creation of an independent National Appeals Division (NAD) within the USDA to review certain adverse agency decisions. See 7 U.S.C. § 6992(a) (2012).

Determination of whether plaintiffs have filed their claims relating to USDA-RD, RHS "adverse decisions" begins with the words in the Reorganization Act. The first step in statutory construction is "'to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'" Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002) (quoting Robinson v. Shell Oil Co, 519 U.S. 337, 340 (1997)); see also Jimenez v. Quarterman, 129 S. Ct. 681, 685 (2009) ("As with any question of statutory interpretation, our analysis begins with the plain language of the statute."); Strategic Hous. Fin. Corp. of Travis Cnty. v. United States, 608 F.3d 1317, 1323 (Fed. Cir.) ("When interpreting any statute, we look first to the statutory language."), reh'g and reh'g en banc denied (Fed. Cir. 2010). The inquiry ceases "'if the statutory language is unambiguous and "the statutory scheme is coherent and consistent."'" Barnhart v. Sigmon Coal Co., 534 U.S. at 450 (quoting Robinson v. Shell Oil Co., 519 U.S. at 340). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 489 n.13 (2004) ("It is, moreover, 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)))); Williams v. Taylor, 529 U.S. 362, 404 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly,

the court must avoid an interpretation of a clause or word which renders other provision of the statute inconsistent, meaningless, or superfluous. See Duncan v. Walker, 533 U.S. at 174 (noting that courts should not treat statutory terms as "surplusage").

When the statute provides a clear answer, the court needs to look no further. See Barnhart v. Sigmon Coal Co., 534 U.S. at 450; see also Am. Airlines, Inc. v. United States, 551 F.3d 1294, 1300 (Fed. Cir. 2008), reh'g granted, 319 F. App'x 914 (Fed. Cir. 2009). Thus, when the "'statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"" Johnson v. United States, 529 U.S. 694, 723 (2000) (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))). In such instances, the court should not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d 388, 391 (Fed. Cir.) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidence by unambiguous language) (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S 469, 476 (1992) and Darby v. Cisneros, 509 U.S. 137, 147 (1993))), reh'g denied and en banc suggestion declined (Fed. Cir. 1994). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." Weddel v. Sec'y of Dep't of Health and Human Servs., 23 F.3d at 391 (citing INS v. Chadha, 462 U.S. 919 (1983)).

Under the terms of the Reorganization Act, a "participant" in a USDA program receiving an adverse agency decision may request an informal hearing on the "adverse decision." 7 U.S.C. § 6995(a) (2012). A "participant" also may appeal an "adverse decision" to the National Appeals Division. See id. § 6996(a). The statute provides:

**(a) Appeal to Division for hearing**

> Subject to subsection (b) of this section, a participant shall have the right to appeal an adverse decision to the Division for an evidentiary hearing by a hearing officer consistent with section 6997 of this title.

Id. The statute defers the definition of the term "participant" to the implementing regulations. See id. § 6991(9). The relevant implementing regulation defines "participant" as follows:

> Participant means any individual or entity who has applied for, or whose right to participate in or receive, a payment, loan, loan guarantee, or other benefit in accordance with any program of an agency to which the regulations in this part apply is affected by a decision of such agency. The term does not include persons whose claim(s) arise under:

> . . .

> (2) Programs governed by Federal contracting laws and regulations (appealable under other rules and to other forums, including to the

Department's [USDA] Board of Contract Appeals under 7 CFR part
24) . . . .

7 C.F.R. § 11.1.

The statute defines the terms "adverse decision" and "agency," as follows:

For purposes of this subchapter:

**(1) Adverse decision**

The term "adverse decision" means an administrative decision made by
an officer, employee, or committee of an agency that is adverse to a
participant. The term includes a denial of equitable relief by an agency or
the failure of an agency to issue a decision or otherwise act on the request
or right of the participant. The term does not include a decision over which
the Board of Contract Appeals has jurisdiction.

**(2) Agency**

The term "agency" means any agency of the Department designated by
the Secretary or a successor agency of the Department, except that the
term shall include the following (and any successor to the following):

. . .

**(E)** The Rural Development Administration.

7 U.S.C. § 6991(1)–(2).

The statute also describes how judicial review of decisions from the NAD will be
conducted:

**Judicial review**

A final determination of the Division [NAD] shall be reviewable and
enforceable by any United States district court of competent jurisdiction in
accordance with chapter 7 of Title 5.

Id. § 6999. Further, the statute provides that judicial review is unavailable before a
claimant exhausts its administrative remedies:

**(e) Exhaustion of administrative appeals**

Notwithstanding any other provision of law, a person shall exhaust all
administrative appeal procedures established by the Secretary or required

20

by law before the person may bring an action in a court of competent jurisdiction against—

>   **(1)** the Secretary;
>
>   **(2)** the Department; or
>
>   **(3)** an agency, office, officer, or employee of the Department.

<u>Id.</u> § 6912(e).

In addition to the clarity of the statutory language of the Reorganization Act, the legislative history of the Act also indicates which USDA programs and activities are intended to fall under the jurisdiction of the newly created NAD, as indicated in the following question and answer included in the legislative record:

>   *Question 1.* List each of the USDA programs and activities that will be appealable under the new National Appeals Division (NAD), which agency these programs and activities are currently under, and how appeals are now handled for them, including discrimination complaints by producers or borrowers?
>
>   Answer. The following constitutes the programs and activities that will fall within the new NAD, the agency such programs or activities currently are under, and how appeals currently are handled for these activities and programs:
>
>>   (a) The loan, loan guarantee, and grant programs currently contained within . . . the Rural Development Administration and proposed for inclusion in the Farm Service Agency . . . including farmer program loans, housing program loans, community and business program loans; and all grants administered by the above agencies . . . .

Questions Submitted by Congressman Stenholm re the National Appeals Division and USDA Answers, H.R. Rep. No. 103–714, pt. 1, at 113 (1994), 1994 WL 461734, at *95. (emphasis in original).

The legislative history of the Reorganization Act also indicates which "programs and activities" are to be excluded from the jurisdiction of the NAD. Notably, the list of excluded programs does not include the USDA Rural Development Assistance Program:

>   *Question 2.* List each of the programs and activities that will not be appealable under the new Division, with an explanation as to why they were not included. Similarly, do you anticipate retaining any existing USDA appeals procedures? If so, which ones, and why?

Answer. The following is a list of the principal categories of programs and activities that will not be appealable under the new NAD and the reasons for their exclusion:

. . .

(g) Agency actions presently appealable to the Department of Agriculture Board of Contract Appeals—such actions directly relate to government procurement and are distinctly different from the program-based appeals that the new NAD is designed to handle [sic] a specific appeals process has been established by statute for the actions.

. . .

With regard to the programs and activities falling within the purview of the new NAD, the existing USDA appeal structures that apply to appeals at the State, county, and local levels in large part, will be retained to ensure continued accessibility, convenience, informality, and expeditious response for program participants. In addition, those existing procedures applicable to programs and activities not covered by the new NAD also will be retained. In short, the scope of the appeals system we have proposed for the new NAD would include all appeals from decisions made under farm programs, farmer loan programs, and other producer-related programs carried out by the county-based USDA agencies, but would not include appeals made under other, unrelated USDA programs. We believe that expansion of the NAD's role beyond these parameters would create an extremely unwieldy mechanism for administrative appeals, and would substantially distort the purpose to be served by consolidating these producer-related and other similar appeals authorities into a single entity within the Department.

Id. at 114–15. (emphasis in original).

Following the enactment of the Reorganization Act, the USDA issued implementing regulations on the "National Appeals Division Rules of Procedures," which track and amplify the statute. See 7 C.F.R. § 11.1, et seq. The regulations define "adverse decision" as:

Adverse decision means an administrative decision made by an officer, employee, or committee of an agency that is adverse to a participant. The term includes a denial of equitable relief by an agency or the failure of an agency to issue a decision or otherwise act on the request or right of the participant within timeframes specified by agency program statutes or regulations or within a reasonable time if timeframes are not specified in

such statutes or regulations. The term does not include a decision over which the [Civilian] Board of Contract Appeals has jurisdiction.

7 C.F.R. § 11.1.

Again, detailing which USDA organizations the NAD was intended to cover, the regulations, like the statute, define "Agency" to include "Rural Development (RD) . . . ." Id. In addition, the regulations include the following directives:

**§ 11.2 General statement.**

(a) This part sets forth procedures for proceedings before the National Appeals Division within the Department . . . . The authority of the Hearing Officers and the Director of the Division, and the administrative appeal procedures which must be followed by program participants who desire to appeal an adverse decision and by the agency which issued the adverse decision, are included in this part.

(b) Pursuant to section 212(e) of the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub.L. 103–354 (the Act), 7 U.S.C. 6912(e), program participants shall seek review of an adverse decision before a Hearing Officer of the Division, and may seek further review by the Director, under the provisions of this part prior to seeking judicial review.

**§ 11.3 Applicability.**

(a) Subject matter. The regulations contained in this part are applicable to adverse decisions made by an agency, including, for example, those with respect to:

(1) Denial of participation in, or receipt of benefits under, any program of an agency;

(2) Compliance with program requirements;

(3) The making or amount of payments or other program benefits to a participant in any program of an agency . . . .

Id. §§ 11.2–11.3.

Moreover, the USDA implementing regulation, like the statute, is explicit regarding when and where disappointed claimants can seek judicial review:

**§ 11.13 Judicial review.**

   (a) A final determination of the Division shall be reviewable and enforceable by any United States District Court of competent jurisdiction in accordance with chapter 7 of title 5, United States Code.

Id. § 11.13.

     In sum, the Reorganization Act and the implementing regulations are clear that a program "participant" must exhaust USDA administrative remedies, by seeking an agency decision and, if disappointed, has the option to file an appeal at the NAD. If the program participant still is dissatisfied, the participant may then appeal to the appropriate United States District Court. The implementing regulations regarding the NAD and USDA-RD are consistent with the statute and reinforce the path a disappointed program participant must follow.

     The government consequently argues that the Reorganization Act precludes this court's jurisdiction over plaintiffs' loan-based claims against USDA-RD, RHS, which, therefore, should be dismissed for lack of jurisdiction under RCFC 12(b)(1). Plaintiffs' claims relating to the terms of the loan, converting the loan from construction to permanent financing status, and responding to new bids submitted by plaintiffs are based on decisions made by USDA-RD, RHS. In order to dispute such actions[7], plaintiffs were required to utilize specific administrative procedures implemented to process claims arising from participation in the underlying USDA Rural Development Assistance Program. Pursuant to the statute, such decisions could then be appealed to the appropriate District Court. See 7 C.F.R. § 11.13. This court lacks jurisdiction to hear attempts to appeal "adverse decisions" issued by USDA-RD, RHS.

## CONCLUSION

     Although the venue shifts faced by these pro se plaintiffs are regrettable, this court does not have jurisdiction over plaintiffs' claims. Therefore, defendant's motion to

---

[7] Plaintiffs also allege that "[t]he Defendant abused its discretion and denied Plaintiffs their right to appeal an adverse decision or about May 7th, 2012, when they converted the loan to permanent financing and charged Plaintiffs the full loan amount . . . but failed to provide Plaintiffs with a safe home." Plaintiffs also state, "Defendants' [sic] repeatedly failed to provide Plaintiffs with basic information concerning the status of their loan . . . failed to provide the Plaintiffs options, as is their right, to challenge determinations made . . . ." The record does not support plaintiffs' allegations. It appears that defendant repeatedly tried to contact plaintiffs about their loan status and the possible conversion of their loan. Moreover, plaintiffs have not provided any evidence in the numerous documents submitted to the court that plaintiffs ever tried to avail themselves of the agency appeal process.

dismiss is **GRANTED,** and the plaintiffs' complaint is **DISMISSED.** The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

      **IT IS SO ORDERED**.

**MARIAN BLANK HORN**
**Judge**